## Reilly's Estate

C. *Townley Larzelere*, of *Larzelere & Wright*, and *Robert Dechert*, of *Dechert, Bok & Smith*, for accountant.

*Frederick B. Smillie, Arthur W. Bean, George F. Baer Appel, Townsend, Elliott & Munson*, and *Saul, Ewing, Remick & Saul*, for assignees of Reilly, Brock & Co., claimants.

HOLLAND, P. J., August 9, 1933.—Decedent was a member of the Philadelphia Stock Exchange at the time of his death. Accountant did not inventory or account for this membership as an asset of the estate because the assignees for the benefit of creditors of the partnership laid claim to it as a firm asset, and the question of its ownership has been submitted to us. While the membership is in decedent's name and thus, prima facie at least, a part of his estate, any doubts which might appear as to the jurisdiction of this court to decide the issue have been resolved by the submission of the parties thereto.

The facts appear in the stipulation of counsel submitted at the audit, to be thus: The membership or "seat", as the customary terminology designates it, was purchased by decedent on October 21, 1913, for $7,500. Payment therefor was made by check of the firm, Reilly, Brock & Co., and this amount was then charged to decedent's individual deposit account with the firm. On October 27, 1913, decedent was reimbursed the cost of the seat by the firm, by means of a credit to decedent's deposit account, and on that same date a charge in that

same amount was entered on the firm's general ledger in a separate account designated "Philadelphia Stock Exchange Seat".

The first written partnership agreement was executed by decedent and Sidney F. T. Brock on November 12, 1913. It is therein provided, that decedent shall contribute $200,000 to the firm capital, "which shall include his seat on the Philadelphia Stock Exchange, insurance thereon, and the other benefits apper-taining to it, at a valuation of $7,500. . . ."

On March 1, 1922, upon the occasion of the admission of three other partners into the firm, a new partnership agreement was executed. It is therein provided that there shall be charged, as a firm expense, the dues and death benefit contributions made by reason of decedent's membership in the exchange; and that death benefits received from the membership shall become firm assets. The agreement further provides for the division of 25 percent of the firm's net profits in proportion to the capital contributions of the partners.

A supplement to the latter agreement, dated May 1923, and an agreement of dissolution, dated February 14, 1925, were both executed by all five partners, but neither contains any reference to the exchange seat.

After the dissolution, decedent and Brock continued the business as partners, under the same firm name but without written agreement, until October 1, 1930, when such an agreement was executed by them. No provision regarding the exchange seat is made therein.

At all times from the date of its original entry to the date of decedent's death, the seat was carried in the firm ledger in the account above mentioned as a firm asset, but it was revalued periodically as it depreciated. The seat was likewise set up as a firm asset in the semiannual audits of the firm accounts during the entire period, which audits were made by well-known public accountants.

From the time decedent acquired the seat until his death, all dues and death benefits charged against it were paid by the firm as a partnership expense. Since decedent's death other dues and death benefits have accrued, and these have been paid by the assignees of the firm for the benefit of creditors, under an agreement with counsel for the accountant to reimburse them if this court holds the estate to be the owner of the seat.

So much for the facts regarding the acquisition of the membership and the subsequent dealing therewith by the partners of Reilly, Brock & Co. Without considering for the moment the peculiar nature of a stock exchange member-ship, and treating it as we would an ordinary kind of property such as a piece of real estate or a block of securities, even assuming that the "property" was decedent's own individual property at the inception of the partnership, it is perfectly clear that it was the intention of all parties concerned, of decedent and the other partners from time to time, that his "property" be part of decedent's contribution to the capital of the firm and therefore a firm asset. The facts that decedent was promptly reimbursed for its cost, its entry on the firm books in a separate account, the references to it in the several agreements, the payment of dues and death benefits by the firm as firm expenses, and the set-up in the audits all establish this beyond doubt. Indeed, in accountant's brief on this question, it is even argued from a summary of these facts that it was the intention of the partners from the date of the "transfer" of the seat to the firm in 1913 that it constitute a firm asset. So we may take it as admitted that the claim of the estate to ownership of the seat rests entirely upon the peculiar nature of a membership in the Philadelphia Stock Exchange, and that but for this peculiarity the assignees would unquestionably be entitled to it as an asset of the firm.

It is stipulated that the constitution and rules of the said exchange restrict

membership therein to individuals who are determined by application, election, and compliance with stated rules of conduct; that membership is a privileged position, the privileges being personal and nonassignable per se; that membership is terminated by death, expulsion, or transfer to a duly qualified successor; and that partnerships cannot be members, nor do partnerships derive any rights to the seat or its proceeds by virtue of the mere fact that one of the partners in the firm is a member.

The constitution of the exchange as in effect at decedent's death provides (presumably after providing that claims of other members shall be preferred against the proceeds realized upon transfer of a seat, although this does not appear in the stipulation) that any surplus "shall be paid to the person whose membership is transferred or to his legal representative upon the execution by him or them of a release . . .". For this provision there was substituted by amendment to the constitution on November 16, 1932 (almost 2 years after decedent's death), a provision that such surplus should be paid as before, "unless the arbitration committee shall determine either ($a$) that the protection of the creditors of the firm registered on the exchange in which said member is a general or special partner requires the use of said surplus or any part thereof, or ($b$) that said member has expressly agreed that said surplus shall be paid to such partnership, in either of which events said surplus shall be paid over to such firm upon the execution by said member or such firm of a release or releases satisfactory to the arbitration committee" (art. 22, sec. 3, par. 4).

The assignees base their claim to ownership principally upon the facts we have already considered, namely that the partners from the beginning considered the decedent's membership a firm asset, and in that respect we have indicated complete accord. On the remaining point, the assignees contend that the restriction on membership to individuals only and the prohibition on firms or corporations becoming members are dictated by reasons of control and supervision alone, because of the obvious facility of controlling the conduct of individuals as against partnerships, each with a different agreement. They further contend that the question before us cannot be governed by the failure of the exchange's constitution to consider the possibility that a membership might in fact not be the property of the person registered as such on its books. They submit that the 1932 amendment to the constitution quoted above, by virtue of which the exchange now will undertake to go into the relation of the exchange member to his firm, indicates that the exchange now would take official notice that in many instances the membership is the property of the firm rather than that of the individual member.

Accountant bases his contention upon the personal nature of membership in the exchange, arguing that it follows therefrom and from the constitution and rules of the exchange that it was impossible for the partners to effectuate their admitted intention to convert the membership from decedent's own asset into a firm asset.

While no authorities are cited either by claimants or accountant in their briefs, the field is not quite so barren as would seem to be indicated thereby. In Thompson v. Adams et al., 93 Pa. 55, Richards, a member of the Philadelphia Stock Exchange, died indebted to various other members. Thompson claimed to be entitled to the proceeds of the sale of Richards' seat on the grounds that he was the equitable owner, having advanced Richards the money with which to buy the seat. The question of Thompson's right to the proceeds was submitted to the court on a case stated. The lower court entered judgment for the exchange, holding that Thompson's title was equitable and, as between him and

the exchange, would be subject to all claims against it created by the laws of the association by reason of Richards' legal membership. The court also says (p. 62) : "A secret holding could not affect the rights of the board, without whose authority the seat or membership could not be held or transferred." The Supreme Court affirmed the judgment, disposing of the case in a one paragraph, per curiam opinion, wherein it is said: "The seat is not property in the eye of the law, it could not be seized in execution for the debts of the members. It is the mere creation of the board, and, of course, was to be held and enjoyed with all the limitations and restrictions which the constitution of the board chose to put upon it." It does not appear in the report for what amount the seat was sold, whether an amount exceeding the indebtedness to other members or not.

In Pancoast v. Gowen et al., Garnishees, 93 Pa. 66, the plaintiff was a judgment creditor of Houston, a member of the Philadelphia Stock Exchange, and brought attachment execution proceedings against the exchange members as garnishees, seeking to levy execution upon the debtor member's seat. The Supreme Court affirmed the lower court's order dissolving the attachment, also by a short per curiam opinion, wherein it is said (p. 71) : "A seat in the board of brokers is not property subject to execution in any form. It is a mere personal privilege, perhaps more accurately, a license to buy and sell at the meetings of the board."

We deem it important to note that both the preceding cases cited involve contests between the exchange members collectively and some outside person, not a member of the exchange, who seeks to intrude upon them by asserting claims which, if allowed, would upset the rules, conditions, and requirements of membership in that body. The question before this court is quite different, involving as it does a controversy between different kinds of creditors of one member of the exchange. The only cases we have been able to find where similar questions were raised are those arising in bankruptcy. In the administration of insolvent estates, bankruptcy is frequently a valuable if not the only source of guidance, unless, of course, the result in bankruptcy is controlled by some provision peculiar to the Bankruptcy Act, or the Federal courts follow a rule of law opposed to that prevailing in Pennsylvania.

Page v. Edmunds, 187 U. S. 596, is doubly interesting and valuable because it considers the two cases just discussed and also involves, with the exception of being a bankruptcy matter, a question almost exactly similar to ours. The case arose in the United States District Court for the Eastern District of Pennsylvania. The bankrupt was a member of the Philadelphia Stock Exchange and failed to include his seat as an asset of his estate in the schedules attached to his petition. The trustee petitioned the referee for an order to sell the seat, and the referee ordered that this be done, subject to the constitution and bylaws of the exchange. The referee's action was sustained in the district court, the circuit court of appeals and the Supreme Court.

Mr. Justice McKenna,, speaking for the court, states that under section 70(5) of the Bankruptcy Act of 1898 title to the membership vested in the bankrupt member's trustee, if the seat was property which could have been by any means transferred or which might have been levied upon and sold under judicial process. The disjunctive provision of the act is emphasized.

Thompson v. Adams et al., supra, and Pancoast v. Gowen, et al., Garnishees, supra, were apparently cited on behalf of the bankrupt to establish a claim of exemption under Pennsylvania law. In considering the former case, the Supreme Court quotes (p. 603) from the opinion the statement we have quoted above, which is to the effect that the seat is not property in the eyes of the law, and describes this language as "not very clear". In our opinion, only one of

the two alternative meanings suggested by Mr. Justice McKenna, is tenable: We believe that the phrase in the Thompson opinion must be taken with the rest of the sentence in which it occurs, and that the Supreme Court of Pennsylvania clearly meant to go no further than to say that an exchange seat is not such property as can be seized in execution. This construction appears conclusive in view of the fact that the Pancoast case, which hinged on this statement, is the very next one reported in 93 Pa., and the court obviously had this case in mind when making the statement in question, which was in fact of no import whatever to the decision in the Thompson case. That this dictum, taken without any qualification, is not supported by the points actually determined by these two cases is perhaps even better brought out in the opinion of the circuit court of appeals in the Page case: In re Page, 107 Fed. 89, 92.

Mr. Justice McKenna then discusses the Pancoast case and approves the conclusion there reached, that to permit a levy of execution on an exchange seat would be to exclude the rights of the other members; yet he holds the trustee in the Page case entitled to the seat, which holding, in view of the expressed approval of the Pancoast case, must be deemed consistent therewith.

In re Stringer (C. C. A. 2), 253 Fed. 352, and In re Amy et al. (C. C. A. 2), 21 F. (2d) 301, are other bankruptcy cases on stock exchange seats of bankrupt exchange members.

Another Pennsylvania case involving an exchange seat is Gartner v. Pittsburgh Stock Exchange, 247 Pa. 482. There an exchange member borrowed money from the plaintiff and assigned his membership to the plaintiff as collateral security, giving notice to the exchange of the assignment. The member then became insolvent and made an assignment for the benefit of creditors, which was followed by bankruptcy. The exchange proceeded according to its rules, sold the bankrupt's seat, and appointed an arbitration committee which allowed claims of other members far in excess of the proceeds of the bankrupt's seat. The plaintiff then brought suit against the exchange for the entire value of the seat. The lower court disposed of the case on binding instructions after plaintiff's testimony was complete, and the Supreme Court affirmed the dismissal of a motion for a new trial, per curiam, on the opinion of Judge Shafer.

This case, again, is a controversy between the exchange and an outsider who seeks to abrogate the rules and conditions upon which the seat claimed was granted the member. The court does not deny that the plaintiff received some rights by virtue of the assignment to him; it merely refuses him greater rights than his assignor would have had as a member if there had been no assignment, namely to be entitled to any proceeds before the claims of fellow members to whom he was indebted were satisfied according to the constitution and bylaws.

In the case at bar, the exchange is not directly involved; the assignees of Reilly, Brock & Co. do not seek to interfere with or abrogate any provision by which the exchange is governed; indeed, in the stipulation an outstanding claim of another member against decedent's seat is recognized as a prior lien against the proceeds thereof. Furthermore, the rules of the exchange, as stipulated, provide that membership therein is terminated by death. Thereupon the membership must be sold, and it follows that the extent of a claim arising out of decedent's membership is a claim against the surplus proceeds remaining after the claims of other members are paid. And even an execution creditor, the court in Pancoast v. Gowen et al., Garnishees, supra, intimates, could reach such proceeds.

Conceding the authority of Thompson v. Adams et al., and Gartner v. Pittsburgh Stock Exchange, supra, as upholding the rules of the exchange and enforcing the priority rights provided for, against conflicting claims of non-

members; conceding also the authority of Pancoast v. Gowen et al., Garnishees, that a stock exchange seat is not property on which execution can be levied; and conceding that such membership is a personal privilege transferable only upon compliance with certain conditions and which can be held only by an individual; nevertheless we do not deem it inconsistent with the authorities cited and restrictions stated to hold that the membership of the decedent belongs to the assignees of Reilly, Brock & Co., as against decedent's estate, and we so hold.

Accountant has treated the claim of the assignees, in the notation in the account, in the petition for distribution, and in his argument, as a claim "in kind" to the membership. The stipulation and claimants' argument do not bear this out but appear to base the claim on "ownership" of the seat. We fail to see how we can regard it as strictly a claim in kind, first of all because, if we attempted to award the seat to claimants, we then would be abrogating the exchange's rules as to membership; secondly, because the seat is not accounted for and is not before us so to award; and lastly, because, as we have already said, decedent's death terminated his membership, and all that can possibly remain to be dealt with are the surplus proceeds after sale of the seat and payment of exchange members' claims.

It appears from the portion of article 22 of the constitution of the exchange which is in evidence and has been quoted above that, after transfer of a membership, the surplus proceeds shall be paid (where the transfer is occasioned by the member's death) "to his legal representative upon the execution by him or them of a release or releases satisfactory to the arbitration committee." In order to exercise the rights adjudicated here, it seems necessary for us to, and we therefore do, order the accountant to execute such release or releases as may be required by the Philadelphia Stock Exchange of all claim of accountant to the surplus proceeds of the sale of decedent's membership and to authorize said exchange to pay over such proceeds to C. S. W. Packard and C. S. Newhall, assignees for the benefit of creditors of Reilly, Brock & Co.

Accountant has requested that, although the claim of the assignees to the membership be upheld, we nevertheless award accountant additional executor's commissions of 5 percent of the value of the membership as of decedent's death, as compensation for accountant's continued efforts over several years to dispose of the seat. Recognizing, as we do, the efficiency of accountant's services in the settlement of this estate generally, and taking as facts accountant's unchallenged allegations respecting his special efforts toward an advantageous sale of the exchange membership, we nevertheless cannot see our way clear to allow this request.

Apparently, accountant's theory is that these additional commissions should come out of the proceeds of the sale of the seat and not out of the general funds of the estate. Patently, the latter would not be tenable. Accountant cites Derrickson's Estate, 16 Del. Co. 221, as the only authority to be found on this question and as being squarely in point. There the executors of a decedent sold real estate, the record title to which was in decedent's name, and took credit for commissions thereon. Exceptions were filed to their account, on the grounds that the proceeds of said real estate belonged to others and not to decedent's estate, and also the executors' commissions on the sale were excepted to. The court found the proceeds of the sale of real estate to be the property of the claimants, yet allowed the commissions because the executors found the property in their decedent's name and merely performed their duty in converting it.

That case does not control our question, because there the property was accounted for and converted, and the fund was produced by the accountant and was before the court for distribution. Here the property was not accounted

for, and was not converted or a fund produced by accountant, and there is nothing before us for distribution. We have no doubt that the commissions there too would have been refused if the executors had only tried, however strenuously, to convert the real estate and had not succeeded. Accountant's claim for additional commissions must be disallowed.

And now, August 9, 1933, this adjudication is confirmed nisi. If no exceptions are filed within 10 days from this date, the adjudication is confirmed absolutely according to rule, and counsel for the accountant will forthwith prepare schedule of distribution, certify that the same is correct and in conformity with this adjudication, which, when approved by the court, will be attachéd to and form part of the same; and Charles A. Reilly, executor as aforesaid, will pay the distributions herein awarded.

From Aaron S. Swartz, Jr., Norristown, Pa.